**SO ORDERED.**

**SIGNED this 15th day of December, 2017.**



_____
Robert E. Nugent
United States Bankruptcy Judge
_____

DESIGNATED FOR ONLINE PUBLICATION

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| IN RE: | |
| MICHAEL DEAN FURMAN<br>MARSHA MARIE FURMAN | Case No. 17-10790<br>Chapter 12 |
| **Debtors.** | |

## ORDER DENYING CONFIRMATION AND GRANTING LEAVE TO AMEND

A family farmer's chapter 12 plan must comply with § 1225(a)'s requirements to be confirmed. Among those requirements, the plan must comply with the provisions of chapter 12 and Title 11.[1] The farmer must propose the plan in good faith and propose treatments of secured claims that allow secured creditors to retain their

_____
[1] 11 U.S.C. § 1225(a)(1).

1

liens while receiving the value of their collateral over a reasonable time.[2] And, the farmer must demonstrate the ability to make the plan payments.[3] The farmer bears the burden of proof on confirmation.

Michael and Marsha Furman propose to retain a field sprayer for Michael's own use, but lease it to their nephew Dustin Furman on an oral lease. Dustin's lease payments will service the modified secured claim of Farm Credit Services of America, PCA (FCS) which is a purchase money obligation secured by the sprayer. FCS's payment term would be extended but it would receive a higher rate of interest than provided by the contract. FCS objects to the lease arguing that the debtor cannot "outsource" paying its claim. It also claims that permitting the lease deprives FCS the right to retain its lien. FCS asserts that the plan is not feasible because Michael Furman testified that he would use the sprayer lease income to fund the plan payments to FCS, but he failed to offer any evidence supporting Dustin's ability to make the lease payments. He offered only the briefest description of the Furmans' lease arrangement. Because the debtors did not bear their burden of proof at trial, confirmation of their amended plan is denied, but leave is granted for debtors to amend their plan within 21 days of the date of this order.[4]

Findings of Fact

---

[2] 11 U.S.C. § 1225(a)(3) and (a)(5)(B).
[3] 11 U.S.C. § 1225(a)(6).
[4] Debtors appear in person and by their attorney David P. Eron. Creditor Farm Credit Services of America, PCA appears by its attorney George Halper. The Chapter 12 trustee Carl Davis also appears.

2

For 20 years, Michael and Marsha Furman have farmed between 700 and 800 acres in Wabaunsee and Pottawatomie Counties in Kansas. Their 25-year old nephew, Dustin, farms about 80 miles away, near Iola in Allen County. Michael and Marsha's amended plan proposed to modify pay the claims of their principal lender, NBH Bank. The Bank did not object to that treatment. Nor has the trustee. Only one other secured creditor objects. Farm Credit Services of America (FCS) objected to the Furmans' proposed treatment of its claim that is secured by a field sprayer.[5]

FCS financed Furman's purchase of a 2011 Spra-Coupe 4660 self-propelled sprayer under a Retail Installment Contract and Security Agreement dated August 21, 2015.[6] FCS loaned Furman $82,350, payable in five annual installments of $18,526.30 beginning on September 1, 2016. The principal balance would bear interest at 3.95% per annum. When Furman defaulted on the first payment, FCS amended the contract on November 10, 2016, modifying the payment schedule, but maintaining the 5-year term, leaving the final payment due at the end of 2020.[7] Furman only partially paid the February 2017 payment, paying $9,000 in April of 2017, money that was provided by Dustin.

The Furmans filed this chapter 12 bankruptcy on May 4, 2017 due to a decline in hay prices and a generally adverse farm economy. On the petition date, Furman owed FCS $69,275.69.[8] The parties agree that the sprayer is worth $83,250.[9] On Part

---

[5] Doc. 73.
[6] Trial Ex. 2, pp. 4-7.
[7] *Id.* at p. 8.
[8] *Id.* at p. 2.
[9] *Id.*

3

6 of Schedule A/B, debtors listed the sprayer, and noted "selling to nephew on contract (Nephew is paying)."[10] This violates FCS's security agreement which provides, among other things, that the debtor may not transfer, sell, assign, rent, lend, relinquish possession, or otherwise alienate the sprayer without FCS's written consent.[11] Nor may the debtor permit anyone other than his employees to use the sprayer.

Furman's first plan proposed to transfer the sprayer to his nephew in exchange for the nephew taking over the payments.[12] After FCS objected to that treatment,[13] Furman amended the plan.[14] FCS would retain its lien in the sprayer and Furman will still own it, but lease it to Dustin. Dustin would pay an annual lease payment of $13,273.87 to Furman that Furman would use to make semi-annual $6,028.71 plan payments to FCS (including the trustee's fee). This would result in a seven-year amortization of FCS's claim, but Furman also proposed to pay 5.5% interest, a higher rate than the contract provided.[15] Furman explained that when the proposed sale was changed to a lease, Dustin was reluctant to pay the amount of the contract payment for a lease.

---

[10] Trial Ex. 1; Doc. 18, p. 12.
[11] Trial Ex. 2, p. 6, ¶ 3. The debtor's attempt to "transfer . . . part with possession, lease or rent" the sprayer constitutes an event of default under the security agreement. *Id.* at p. 7, ¶ 9(c).
[12] Doc. 44, p. 9, Class 8 – Secured Claim of Farm Credit/AgDirect.
[13] Doc. 49. FCS also filed a motion for relief from the automatic stay alleging that debtors had no equity in the sprayer and that it was unnecessary to an effective reorganization. Doc. 51.
[14] Doc. 59 – Amended Chapter 12 Plan dated September 22, 2017.
[15] *Id.* at p. 10. *See* Ex. J, Budget attached as Ex. B - Sprayer Lease Income.

4

The Furmans' sprayer lease is oral. According to Michael Furman, Dustin will pay lease payments in advance, and Michael will retain possession and use of the sprayer.[16] Furman testified that if Dustin defaults, he would sell the sprayer and hire a commercial spraying operator. When Dustin needs the sprayer, Michael will trailer it to and from Iola. Between them, Michael estimates that he and Dustin would use the sprayer between 120 and 150 hours per year.

FCS's litigation officer, Michael Spence, testified that he anticipated the sprayer would depreciate between 10% and 15% per year and that FCS feared the seven-year amortization period would outlast the sprayer's useful life. A simple calculation shows that this fear is unfounded. The table below demonstrates that by applying an annual rate of depreciation of 15% the sprayer will not be fully depreciated at the end of seven years, when FCS's claim would be paid in full under the amended plan.

| Year | Sprayer Value | Annual 15% Depreciation | Accumulated Depreciation | Ending Sprayer Value |
|---|---|---|---|---|
| 1 | $83,250 | $12,488 | $12,488 | $70,763 |
| 2 | $70.763 | $10,614 | $23,102 | $60,148 |
| 3 | $60,148 | $9,022 | $32,124 | $51,126 |
| 4 | $51,126 | $7,669 | $39,793 | $43,457 |
| 5 | $43,457 | $6,519 | $46,312 | $36,938 |
| 6 | $36,938 | $5,541 | $51,852 | $31,398 |
| 7 | $31,398 | $4,710 | $56,562 | $26,688 |

---

[16] Without the sprayer, Furman testified that he would have to hire a commercial operator to spray his fields with an attendant increase in operating expenses. He also said the sprayer would not be used for custom spraying.

5

Because this sprayer came with a new engine when Furman bought it in 2015, the rate of depreciation may even be slower than anticipated.[17] If the Furmans use the sprayer 150 hours a year, seven years will only add 1,050 hours to its service time. Even Mr. Spence conceded that if appropriately maintained, the sprayer will likely retain some value at the end of seven years. Michael Furman maintains $100,000 worth of insurance coverage on the sprayer, but there was no indication that Dustin would insure his interest in it.

FCS objects to confirmation on several legal grounds including (i) lack of good faith; (ii) improper secured creditor treatment; and (iii) feasibility. After trial, Furman filed a written "Equipment Lease Agreement" that leases the sprayer to Dustin.[18] The written lease, however, adds Dalton Furman as an authorized operator of the sprayer; Dalton's use of the sprayer was not mentioned at trial. The new equipment lease agreement does not figure in the Court's ruling today.

Analysis and Conclusions of Law

*Good Faith*

Section 1225(a)(3) requires that the debtor propose the plan in good faith. If a creditor shows facts suggesting the lack of good faith, the burden of proof passes to the plan proponent to show that those facts were the result of inadvertence or

---

[17] Furman testified that the 2011 sprayer had about 750 hours on it at the time of purchase.
[18] Doc. 81.

6

mistake.[19] Some courts hold that the debtor has the burden of proving that the plan was proposed in good faith and creditors have the burden of showing a lack of good faith.[20] Courts in the Tenth Circuit are directed to consider the eleven *Flygare* factors as well as "any other relevant circumstances" to determine, considering the totality of the circumstances, whether the debtor has proposed the plan in good faith.[21] Among the *Flygare* factors that might apply here are the extent to which secured claims are modified and the debtor's motivation and sincerity. Nothing in the record or Mr. Furman's demeanor suggested that he lacks motivation or sincerity, though his initially-proposed oral sale of the sprayer in violation of FCS's security agreement warrants concern. So does Dustin's previously undisclosed (and unauthorized) use of the sprayer prior to the Furmans' filing their petition. While Furman's proposed modification of the FCS secured claim is somewhat creative, it does not show a lack good faith per se. By increasing the interest rate by 155 basis points, Furman compensates for extending the term of the note. He proposes to pay FCS's claim in full. Assuming normal depreciation, at no time will FCS be undersecured. I conclude that the plan was proposed in good faith.

*Secured Claim Modification and Lien Retention*

---

[19] Hon. Barry Russell, 2 *Bankruptcy Evidence Manual*, § 301:95 (2016-17 ed.).
[20] *In re Pertuset*, 492 B.R. 232, 255 (Bankr. S.D. Ohio 2012), *aff'd* 485 B.R. 478 (Table), 2012 WL 6598444 at *14-15 (6th Cir. BAP Dec. 18, 2012).
[21] *See In re Cranmer*, 697 F.3d 1314, 1318-19 and n. 5 (10th Cir. 2012) (chapter 13 case), referring to *Flygare v. Boulden*, 709 F.2d 1344, 1347 (10th Cir.1983). *See also, In re Krier,* No. 14-12439, 2016 WL 2343038 at *5 (Bankr. D. Kan. Apr. 29, 3016) (applying *Flygare* in chapter 12 case); *In re Sorrell,* 286 B.R. 798, 805 (Bankr. D. Utah, 2002) (applying *Flygare* factors to chapter 12 plan).

Section 1225(a)(5) addresses how secured claims must be treated. Section 1222(b)(2) allows a chapter 12 plan proponent to modify a secured creditor's rights. The debtor may extend the repayment term beyond the end date of the debtor's plan under § 1222(b)(9) and 1225(a)(5). Any such modification must pass muster under the confirmation provision, § 1225(a)(5)(B). That subsection requires that the plan provide for FCS to retain its lien.[22] This plan's express language provides for that, but varies the following provisions of the security agreement:

> Buyer will not, without the prior written consent of … [FCS]: (a) voluntarily or involuntarily transfer, sell, assign, pledge, sublet, lend, grant a security interest in, relinquish possession of, or otherwise hypothecate Buyer's interest in this Contract or the Equipment; or (b) permit the Equipment … to be used by anyone other than Buyer or Buyer's employees.[23]
>
> ***
>
> An event of default . . . shall occur hereunder if any Buyer . . . (c) attempts to remove, sell, transfer, encumber, part with possession, lease or rent the Equipment or assign Buyer's rights or duties hereunder;[24]

The lien-retention requirement is a limitation on debtor's right to modify secured claims and is construed strictly.[25] Most of the cases concerning lien retention address proposals to sever cross-collateralization clauses, subordinate liens, or substitute collateral.[26] All Mr. Furman proposes is leasing the sprayer to Dustin Furman subject

---

[22] Section 1225(a)(5)(B)(i)
[23] Trial Ex. 2, p. 6 at ¶ 3.
[24] *Id.* at p. 7, ¶ 9.
[25] *In re Chickosky,* 498 B.R. 4, 18 (Bankr. D. Conn. 2013).
[26] *See In re Clark,* 288 B.R. 237, 249-50 (Bankr. D. Kan. 2003) (severance of bank's cross-collateralized lien was impermissible alteration of lien and violated lien retention requirement); *In re Beach,* 169 B.R. 201, 206 (D. Kan. 1994) (chapter 12 plan that subordinated undersecured creditor's lien violated lien retention requirement and could not be confirmed); *In re Woerner,* 214 B.R. 208, 210-11

8

to FCS's lien. Some courts entertain those proposals. In *In re Nelson,* a dairy farmer proposed to lease a dairy barn and related improvements to a third party to fund the plan with debtor to act as the manager. When the lienholder objected, the court held that if the plan provided expressly that the lender would retain its lien, that treatment could be confirmed.[27] But because Nelson's plan inadvertently omitted an express lien retention provision, confirmation was denied. The *Nelson* court also noted that without a committed lessee, it could not find that the plan was feasible. Confirmation was denied, but the debtors received "an opportunity to negotiate and finalize a proposed lease."[28]

The proposed lease to Dustin does not alter FCS's sprayer lien; that lien still attaches wherever the sprayer is located and whoever possesses it, even if the lease violates the security agreement's terms. As the declining balance depreciation table, *supra,* suggests, the amount Furman proposes to pay should keep pace with depreciation if the sprayer is not abused and is properly maintained. The modifications of the term and interest rate do not pose a threat to adequate protection.[29] While nothing prevents a chapter 12 debtor from using, selling, or

---

(Bankr. D. Neb. 1997) (holder of tax certificate obtained by paying property taxes on farm was deprived of its tax lien where the lien would lapse under state law before he would be paid in full.; *In re Ames,* 973 F.2d 849 (10th Cir. 1992) (plan that substituted second mortgage interest in real property for secured creditor's lien on livestock and equipment could not be confirmed over secured creditor's objection; plan sought to replace the secured creditor's collateral).
[27] 291 B.R. 861 (Bankr. D. Idaho 2003).
[28] *Id.* at 863.
[29] *See In re Borg,* 88 B.R. 288 (Bankr. D. Mont. 1988) (plan couldn't be confirmed where principal reduction didn't keep pace with depreciation on underlying security – creditor would not be retaining lien on its security that would be as valid as lien

9

leasing property of the estate under §§ 363 or 1205, the terms of such use, sale, or lease should have been noticed to the creditors for their consideration. They weren't.[30]

*Feasibility*

Even if the proposed FCS claim treatment passed muster under § 1225(a)(5), the Furmans did not prove that FCS's treatment is feasible as § 1225(a)(6) requires. We heard no evidence of Dustin's ability to make the $13,273 annual lease payments.[31] According to Furman, Dalton declined to re-finance the sprayer with FCS in his own name because he was in the process of purchasing a farm. Rather, Furman says that he will use Dustin's annual advance lease payment to make the two semi-annual FCS plan payments. This suggests that he himself *can't* make the FCS plan payment and also signals a risk that those funds not used for one semi-annual payment might not be available to make the second one. After all, Furman has *never* made a timely contract payment and his first-payment default caused FCS to amend the contract and revise the payment schedule. Furman stated that if Dustin "backed out" of the verbal lease, he would sell the sprayer. He also stated that he had

---

on date of confirmation); *In re Hanna*, 912 F.2d 945 (8th Cir. 1990) (lien on cattle herd rather than particular cattle comprising herd); *Wells Fargo Financial Leasing Inc. v. Grigsby,* 2014 WL 117262 at *5-8 (D. N.D. Ala. 2014) (the lien retention requirement implies an inquiry into adequate protection; a creditor does not truly retain its lien if the value of the collateral diminishes faster than plan payments are made on the secured claim; oversecured creditor retained its lien despite changes to the payer and payment amount).

[30] The post-trial equipment lease agreement, doc. 81, does not cure this defect where the written agreement does not fully square with Furman's testimony of the oral lease terms.

[31] Furman's trial testimony acknowledged that Dustin's lease payments were less than the $18,500 annual payment when Dustin was purchasing the sprayer on contract, calling into doubt Dustin's financial wherewithal.

10

little to no income from his farming operation in 2017, nor could he recall how much income he earned in his farming operation prior to that.[32] Taken together, all of this suggests that Furman cannot fund the FCS plan payment without Dustin's assistance. He failed to show how Dustin can make the lease payments or how its terms protect FCS's interests. These failures doom the amended plan to defeat.[33] Confirmation must be denied.

Conclusion

The debtors are granted 21 days to file an amended plan. The Court reserves its ruling on the FCS stay relief motion[34] pending the filing of a further amended plan unless, in the meantime, FCS requests a further hearing on that motion.

FCS's objection to confirmation is SUSTAINED and confirmation is DENIED without prejudice to the debtors proposing a second amended plan within 21 days of this Order's entry. Otherwise, the case will be dismissed.

# # #

---

[32] The Furmans offered no historical income data for their farming operation at trial.
[33] Among other things, a credible plan supported by a written lease might provide for Dustin to abide by all the covenants and conditions of FCS's security agreement and to execute a financing statement so that all comers (including Dustin's creditors) would be on notice of FCS's lien.
[34] Doc. 51.

11